**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JORGE YARUR BASCUÑAN;
TARASCONA CORP.; HOFSTRA CORP.;
INMOBILIARIA MILANO S.A.;
INMOBILIARIA E INVERSIONES TAURO
S.A.; INVERSIONES T & V S.A.,

                      Plaintiffs,

                -v-

DANIEL YARUR ELSAca;
CRISTIAN JARA TAITO; OSCAR BRETÓN
DIEGUEZ; JOSÉ PEDRO SILVA PRADO;
GM & E ASSET MANAGEMENT S.A.;
FINTAIR FINANCE CORP.; EUWELAND
CORP.; HAY'S FINANCE CORP.; CARY
EQUITY'S CORP.L; AGRÍCOLA E
INMOBILIARIA CHAUQUÉN LIMITADA;
ALAPINJDP INVESTING CORP.; JOHN
DOES 1-10,

                      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

OPINION

15-cv-2009 (GBD)

GEORGE B. DANIELS, United States District Judge:

Plaintiffs Jorge Yarur Bascuñan, Tarascona Corp., Hofstra Corp., Inmobiliaria Milano S.A., Inmobiliaria E Inversiones Tauro S.A., and Inversiones T & V S.A (together, excluding Bascuñan, "Corporate Plaintiffs"),[1] bring this private right of action under the Racketeer Influenced Corrupt Organizations Act ("RICO"), *see* 18 U.S.C. §§ 1962(c),(d), 1964(c), against Defendants Daniel Yarur Elsaca, Cristián Jara Taito, Oscar Bretón Dieguez, José Pedro Silva Prado (together, "Individual Defendants"),[2] GM & E Asset Management, S.A., Fintair Finance

---

[1] The Corporate Plaintiffs were all organized under the laws of Chile or the British Virgin Islands, and are all owned and controlled, directly or indirectly, by Bascuñan. (Amended Complaint ("AC"), (ECF No. 18), at ¶¶ 8-13.)

[2] The Individual Defendants are all citizens and residents of Chile. (AC at ¶¶ 14-17.)

Corp., Euweland Corp., Hay's Finance Corp., Cary Equity's Corp., Agrícola E Inmobiliaria Chauquén Limitada, Alapinjdp Investing Corp. (together, excluding Individual Defendants, "Corporate Defendants"),[3] and John Does 1-10.[4]  (*Id.* at ¶¶ 162-206.)  Plaintiffs also bring state-law claims for unjust enrichment, a constructive trust, and an accounting.[5]  (*Id.* at ¶¶ 207-25.)  Now pending before this Court is Defendants' motion to dismiss Plaintiffs' claims.

## I.   Background[6]

Bascuñan is a citizen and resident of Chile.[7]  (*Id.* at ¶ 7.)  When Bascuñan's parents died in the 1990s, he inherited a substantial fortune (the "Bascuñan Estate"), which included a substantial number of shares in Banco de Credito e Inversiones ("BCI Shares"), the third-largest bank in Chile.  (*Id.* at ¶ 34.)  At the time of his parents' deaths, and for years afterward, Bascuñan was unfit to manage his finances due to serious health issues.  (*Id.* at ¶ 35.)  In 1999, Bascuñan hired his cousin, Elsaca—a licensed accountant, prominent Chilean economist, and, at the time, the head of the Superintendencia de Valores y Seguros (de Chile) (*i.e.*, Chile's equivalent of the U.S. Securities and Exchange Commission)—to take over the management of the Bascuñan Estate. (*Id.* at ¶¶ 36, 38.)

---

[3] The Corporate Defendants were all organized under the laws of either Chile or the British Virgin Islands, which are also their respective principal places of business.  All of the Corporate Defendants are owned and controlled, directly or indirectly, by Elsaca.

[4] The John Doe Defendants are entities that are owned and/or controlled by Elsaca, but whose names and domiciles are currently unknown.  (*Id.* at ¶ 25.)

[5] There have already been and continues to be numerous legal proceedings in Chile involving Bascuñan and Elsaca (at the very least) that arise from the same operative facts as those alleged in this action.  (*Id.* at ¶¶ 147-51; Oral Argument Transcript, (ECF No. 59), at 8:13-17, 65:23-66:9, 98:15-99:23.)

[6] The following facts are assumed true for purposes of adjudicating Defendants' motion to dismiss.

[7] In 1997, prior to the events constituting the alleged wrongdoing in this action, Bascuñan was deported from the United States; at present, he is still prohibited from re-entering the country.  (Declaration of Daniel Yarur Eslaca, (ECF No. 38), at ¶ 9; Oral Argument Transcript, (ECF No. 59), at 102:5-16 (Bascuñan's counsel admitting that he is banned from entering the United States and would need a waiver of admissibility to testify in person if this action were to proceed to trial).)

Shortly thereafter, Bascuñan granted Elsaca power of attorney ("POA") to manage Bascuñan's affairs and finances, including the power to engage in self-dealing transactions without first obtaining Bascuñan's signature or specific authorization. (*Id.* at ¶¶ 39, 42.) At the time Bascuñan executed the POA, he was suffering from AIDS, drug addiction, depression, and was in an Italian hospital awaiting hip-replacement surgery. (*Id.* at ¶ 40.) The POA was drafted by Elsaca with assistance from Silva, his personal attorney. (*Id.*) Plaintiffs allege that Elsaca did not explain the scope or implications of the POA to Bascuñan, and did not recommend that Bascuñan retain separate counsel before executing the POA. (*Id.* at ¶ 41.)

Using the extraordinarily broad powers granted in the POA, the Amended Complaint alleges that Elsaca and the other Individual Defendants conspired and, in fact, perpetrated several fraudulent schemes, often utilizing the Corporate Defendants, which are alleged to have been Elsaca's alter egos, to siphon millions of dollars from the Bascuñan Estate. (*See id.* at ¶¶ 4-5, 152-61.) Some of the schemes consisted of generating "sham" management fees—*i.e.*, charging the Bascuñan Estate for investment or legal services that were not actually provided or had already been paid for. (*See id.* at ¶¶ 4-5, 46-69, 77-81.) Another scheme involved the embezzlement of large dividend payments that properly belonged to Bascuñan. (*See id.* at ¶¶ 4-5, 118-22.) The funds targeted and misappropriated by Elsaca and his alleged co-conspirators were often held in New York bank accounts. (*See id.* at ¶¶ 5, 30, 55-56.) The Defendants allegedly made these fraudulent transactions by causing the New York banks holding Plaintiffs' funds to wire money from Plaintiffs' accounts to Defendants' accounts located in New York and elsewhere.

The Amended Complaint alleges that Defendants also fraudulently misappropriated a portion of Bascuñan's BCI Shares. At the time Bascuñan signed the POA, he held a portion of his BCI shares, representing 1.47% of BCI's outstanding stock, through Corporate Plaintiffs

Tarascona and Hofstra.  (*Id.* at ¶ 88.)  More specifically, the shares were owned by Tarascona, which was wholly-owned by Hofstra.  (*Id.*)  Hofstra's interest in Tarascona was represented by bearer shares stored in a safety deposit box at a J.P. Morgan branch in New York.  (*Id.*)

The Amended Complaint alleges that Elsaca, or an agent acting on his behalf, traveled to New York to retrieve the shares from the safety deposit box.  (*Id.* at ¶ 94.)  Elsaca was able to take the bearer shares because he had access to the safety deposit box as a result of the POA, and because he was in physical possession of the keys.  (*Id.*)  Elsaca then arranged for the bearer shares to be physically transported out of New York and into Panama, where he had retained a law firm to effect a transfer of ownership of Tarascona, and thus, the BCI Shares.  (*Id.*)

Elsaca effectuated the transfer by first directing the Panamanian law firm to incorporate a company called Nueva T Corp. ("New Tarascona") in the British Virgin Islands.  (*Id.* at ¶ 90.)  He then directed the law firm to issue 50,000 shares of New Tarascona in favor of Euweland, another company which he wholly owned.  (*Id.* at ¶ 91.)  Purportedly acting on behalf of Hofstra pursuant to the POA, Elsaca then directed the law firm to cancel the bearer shares that he had removed from the J.P. Morgan safety-deposit box demonstrating Hofstra's ownership of Tarascona, and to register Tarascona's shares in the name of New Tarascona.  (*Id.* at ¶¶ 92-93.)  By registering the Tarascona bearer shares in the name of New Tarascona, Elsaca fraudulently transferred Bascuñan's BCI Shares to himself.  (*Id.*)  At the time of the transfer, the shares were worth approximately $47 million.  (*Id.* at ¶ 95.)  Finally, the Amended Complaint alleges that Elsaca decided to "sell" the BCI shares back to Bascuñan.  (*Id.* at ¶ 97.)  On December 21, 2007, Elsaca caused funds ultimately belonging to Bascuñan to "purchase" the stolen BCI shares from Euweland for $43 million.  (*Id.* at ¶¶ 97-98.)

## II.     Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, a "complaint must contain sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."   *Id.* (internal quotation marks and citation omitted).   This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.*

## III.     RICO Claims

Section 1962(c) of Title 18 of the United States Code, part of the Racketeer and Influenced Corrupt Organizations Act, makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."[8]   18 U.S.C. § 1962(c).   "To establish a violation of § 1962(c), a plaintiff must show that a person engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."   *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (citation and internal quotation marks omitted).   "Racketeering activity" "encompass[es] dozens of state and federal offenses, known in RICO parlance as predicates.   These predicates include any act indictable under specified federal statutes, as well as certain crimes chargeable under state law . . . ."   *RJR Nabisco, Inc. v. European Cmty.*, ___ U.S. ___, 136 S. Ct. 2090, 2096 (2016) (internal citations and quotation marks omitted).

---

[8] The act also makes it unlawful for any person to conspire to violate § 1962(c).  18 U.S.C. § 1962(d).

Violations of § 1962 are subject to criminal penalties, including imprisonment, fines or both. 18 U.S.C. § 1963. Civil proceedings enforcing RICO's substantive prohibitions may be instituted by the Attorney General. 18 U.S.C § 1964(b). Additionally, Congress provided for private civil actions by allowing "[a]ny person injured in his business or property by reason of a violation of section 1962" to sue in federal district court and recover treble damages, costs and attorney's fees.[9] 18 U.S.C. § 1964(c).

Recently, the Supreme Court considered the extraterritorial application of RICO. It determined that the extraterritorial inquiry "really involves two questions. First, do RICO's substantive prohibitions, contained in § 1962, apply to conduct that occurs in foreign countries? Second, does RICO's private right of action, contained in § 1964(c), apply to injuries that are suffered in foreign countries?" *RJR Nabisco*, 136 S. Ct. at 2099. Applying the presumption against extraterritoriality[10] to answer the first question, the Court held that "§ 1962[c] applies to foreign racketeering activity—but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially."[11] *Id.* at 2102. Thus, violations of § 1962(c) are subject to criminal prosecution, 18 U.S.C. § 1963, or civil proceedings instituted by the Attorney General, 18 U.S.C. §1964(b), only when "the alleged pattern of racketeering activity consists entirely of

---

[9] The complete provision provides: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final." 18 U.S.C. § 1964(c).

[10] The presumption against extraterritoriality stands for the proposition that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* at 2100.

[11] The Court's holding applies to § 1962(b), as well. *Id.* at 2103. The Court did not definitively settle the extraterritorial application of §1962(a) or § 1962(d). *Id.*

predicate offenses that were either committed in the United States or committed in a foreign country in violation of a predicate statute that applies extraterritorially."[12] *See id.* at 2105.

The Court then turned its attention to whether RICO's private right of action applies to injuries that are suffered in foreign countries. *See id.* at 2106-11. The Court determined that "[i]rrespective of any extraterritorial application of § 1962, . . . § 1964(c) does not overcome the presumption against extraterritoriality." *Id.* at 2106. Accordingly, the Court held that "Section 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries." *Id.* at 2111. Because the respondent-plaintiffs had stipulated in district court that they had not suffered any domestic injuries, the Court did not need to concern itself with deciding whether the alleged RICO injury was "foreign" or "domestic," even though it recognized disputes over where an injury occurred might arise in the future. *Id.*

Just such a dispute is now before this Court. Both parties principally rely on New York law to argue whether the alleged injuries suffered by Bascuñan and the Corporate Plaintiffs are "foreign" or "domestic." Defendants rely on the accrual rules applied under New York State's choice-of-law statute, N.Y. C.P.L.R. 202. When applying this statute to determine where an economic injury accrued, courts typically ask two common-sense questions: "[1] who became poorer, and [2] where did they become poorer." *Deutsche Zentral-Genossenchaftsbank AG v. HSBC N. Am. Holdings, Inc.*, No. 12 CIV. 4025 AT, 2013 WL 6667601, at *6 (S.D.N.Y. Dec. 17, 2013) (quoting *Baena v. Woori Bank*, No. 05-CV-7018 (PKC), 2006 WL 2935752, at *7 (S.D.N.Y. Oct. 11, 2006)). This inquiry usually focuses upon "where the economic impact of the injury was ultimately felt." *Id.* at *7 (citation, quotation marks, and emphasis omitted). "[T]hat place is

---

[12] "[A] RICO enterprise [also] must engage in, or affect in some significant way, commerce directly involving the United States . . . . Enterprises whose activities lack that anchor to U.S. commerce cannot sustain a RICO violation." *Id.* at 2105.

normally the state of plaintiff's residence." *Id.* at *5 (quoting *Gorlin v. Bond Richman & Co.*, 706 F. Supp. 236, 240 (S.D.N.Y.1989)); *see also Vincent v. Money Store*, 915 F. Supp. 2d 553, 568 (S.D.N.Y. 2013) (place of injury is "where the plaintiff resides and sustains the economic impact of the loss, rather than where the defendant committed the wrongful acts" (internal citations omitted)). "Foreign corporations reside either in their principal place of business or their place of incorporation." *Deutsche Zentral-Genossenchaftsbank*, 2016 WL 6667601, at *5 (citing *Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 494-95 (S.D.N.Y. 2013)); *cf. Daimler AG v. Bauman*, ___ U.S. ___, 134 S. Ct. 746, 761 (2014) (stating that a corporation is essentially "at home" where it is incorporated or has its principal place of business).

Exceptions to this rule are reserved for "extremely rare case[s] where the party has offered unusual circumstances." *Robb Evans & Assocs. LLC v. Sun America Life Ins.*, No. 10 Civ. 5999, 2012 WL 488257, at *4 (S.D.N.Y. Feb. 14, 2012) (quoting *Baena*, 2006 WL 2935752, at *6). Because holding money in a New York bank account or conducting some financial operations in New York are relatively commonplace, standing alone, these bases are ordinarily insufficient to find that economic injury occurred in New York. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *118 (S.D.N.Y. Oct. 20, 2015) ("Because many institutions have some financial connection to New York, an overbroad . . . exception would swallow the rule that economic injury attaches at the place of residence.").

Plaintiffs, on the other hand, primarily rely on N.Y. C.P.L.R. 302(a)(3), part of New York's personal jurisdiction long-arm statute. In relevant part, CPLR 302(a)(3) provides "[A] court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent: . . . . commits a tortious act without the state causing injury to person or property within the state . . . ." To determine whether the "injury to person or property" occurred "within the state," New York

courts "'generally apply a situs-of-injury test . . . .'" *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001) (quoting *Bank of Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 791 (2d Cir. 1999)).  Under CPLR 302(a)(3), "[t]he situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are felt by the plaintiff." *Id.* (quoting *Mareno v. Rowe*, 910 F. 2d 1043, 1046 (2d Cir. 1990)).

Thus, the tests proposed by Plaintiffs and Defendants are almost diametrically opposed. The Plaintiffs' test, being jurisdictional in nature, focuses on the location of the defendant's conduct and contacts, not the location of the plaintiff or where the injury was suffered. *See Asahi Metal Indus. Co., Ltd. v. Superior Ct.*, 480 U.S. 102, 109 (1987) (stating personal jurisdiction is based on "the actions [of] the defendant *himself*" and that "minimum contacts must be based on an act of the defendant").  On the other hand, Defendants' test focuses on where the plaintiff suffered the injury alleged, not the location of the defendant's allegedly wrongful conduct. Although the Supreme Court offered no explicit framework regarding how to determine whether an alleged RICO injury is "foreign" or a "domestic," *see RJR Nabisco*, 136 S. Ct. at 2111, a close reading of its opinion provides guidance as to whether Defendants' or Plaintiffs' is the better approach.

In its opinion, the Supreme Court made clear that the location of the *defendant*'s *conduct* alleged to have violated the substantive prohibitions in § 1962 dictates whether the defendant may be prosecuted criminally or subject to civil proceedings instituted by the Attorney General.  *See id.* at 2099 (stating first question is whether "RICO's substantive prohibitions, contained in § 1962, apply to *conduct* that occurs in foreign countries" (emphasis added)); *id.* at 2101 ("If the *conduct* relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other *conduct* occurred abroad . . . .") (Emphasis added).

In contrast, the location where the *plaintiff suffered* the alleged injury dictates whether the plaintiff may pursue a private right of action under § 1964(c). *See id.* at 2108 ("Nothing in § 1964(c) provides a clear indication that Congress intended to create a private right of action for injuries *suffered* outside of the United States." (Emphasis added)); *id.* at 2111 (dismissing RICO claims because they "rest[ed] entirely on injury *suffered* abroad" (emphasis added)).

Determining the location where a putative *plaintiff suffered* an alleged injury to determine whether that plaintiff has a private cause of action under § 1964(c) is an inquiry that is independent of the inquiry determining the location of a *defendant*'s *conduct* to determine the applicability of § 1962's substantive prohibitions. *See id.* at 2108 ("[T]he presumption against extraterritoriality must be applied *separately* to both RICO's substantive prohibitions and its private right of action." (Emphasis added, internal citation omitted)); *id.* at 2106 ("[L]ogic requires that we *separately* apply the presumption against extraterritoriality to RICO's cause of action despite our conclusion that the presumption has been overcome with respect to RICO's substantive prohibitions." (Emphasis added)); *id.* at 2113 (Ginsburg, J., concurring in part, dissenting in part, and from the judgment) (disagreeing with majority's rule "separating[] prohibited activities and authorized remedies"). Accordingly, there will be situations where a defendant's conduct will be subject to criminal prosecution and civil proceedings instituted by the Attorney General—perhaps because it "consists entirely of predicate offenses that were . . . committed in the United States," *id.* at 2105 (majority opinion)—and subject to a private right of action by a domestic plaintiff, but not a foreign plaintiff, based on where each plaintiff suffered their respective injuries, *see id.* at 2115 (Ginsburg, J., concurring in part, dissenting in part, and from the judgment) (noting that majority's rule makes RICO private cause of action "available to domestic but not foreign plaintiffs"); *id.* at 2115-16 (noting majority's rule means defendants will "be answerable civilly to U.S. victims of their

criminal activities, but foreign parties similarly injured [will] have no RICO remedy"); *id.* at 2105, 2111 (majority opinion) (alleged pattern of racketeering activity might have consisted of predicate offenses committed in the United States, but plaintiffs could not maintain private right of action because injury was foreign).

Based on this reading, Defendants' proposed test, which focuses on the *plaintiff* and where the alleged injury was *suffered*, is the appropriate approach to determine whether a plaintiff may maintain a private cause of action under § 1964(c).[13] Plaintiffs' proposed approach—which focuses on whether the *defendant*'s contacts with the forum are sufficient to comport with due process—to determine where a *plaintiff suffered* an alleged RICO injury—is misguided.[14]

Applying Defendants' proposed rule, it is clear that the Amended Complaint has only alleged a "foreign" injury. The RICO injury alleged is an economic loss of approximately $64 million. (AC at ¶¶ 201, 206, 225A.) All of the funds at issue, even those distributed among the Corporate Plaintiffs, were purportedly owned by Bascuñan, and thus, he is the person that ultimately suffered the loss. (*Id.* at ¶¶ 13, 34.) And as a Chilean citizen and resident, he suffered the losses in Chile.

Plaintiffs cite case law for the proposition that "[g]enerally, in a conversion case, the tort and the injury will occur in the same location—where the conversion actually occurred." (Response to Defendants' Letter Concerning *RJR Nabisco*, (ECF No. 63), at 2 (citing *Popper v. Podhragy*, 48 F. Supp. 2d 268, 274 (S.D.N.Y. 1998).) This is not a conversion case; it is a RICO

---

[13] Plaintiffs argue that the policy underlying the test to determine where an injury occurred in the claim-accrual context—*i.e.*, the prohibition against forum shopping—is not applicable to RICO. *RJR Nabisco*, however, suggests just the opposite. The Court reasoned that the presumption against extraterritoriality is applicable not only to the substantive prohibitions set forth in § 1962, but also to § 1964(c), so that the international friction that might result from allowing foreign citizens to bypass their own less generous remedial schemes in favor of U.S. remedies may be avoided. *Id.* at 2106.

[14] In this context, designating the analysis under CPLR 302(a)(3) the "situs-of-injury test" could be considered a misnomer.

Case 1:15-cv-02009-GBD   Document 66   Filed 09/28/16   Page 12 of 13

case. The RICO injury alleged is the loss of approximately $64 million due to an alleged pattern

of racketeering activity consisting of wire fraud, mail fraud and bank fraud. The conversion cases

cited by Plaintiffs are therefore inapposite and do not provide a basis for disturbing the usual rule

that economic loss occurs where its impact is felt.[15] (*See id.* (also citing *Transportes Aereos de

Angola v. Ronair, Inc.*, 693 F. Supp. 102, 112 (D. Del. 1988) (evaluating where conversion-claim

injury occurred) and *U.S.O. Corp. v. Mizuho Holding Co.*, 2007 WL 2893628, at *8 (N.D. Ill. Sept.

27, 2007) (evaluating where state-law claims, including claim for conversion, occurred).)

Finally, even if was determined that the Corporate Plaintiffs suffered economic injury, they

too, suffered their injuries abroad because each was incorporated in the British Virgin Islands or

Chile, and the Amended Complaint has not alleged that their principal places of business are the

United States. (*See* AC at ¶¶ 8-13.) Because § 1964(c) "requires a civil RICO plaintiff to allege

and prove a domestic injury to business or property and does not allow recovery for foreign

injuries," Defendants' motion to dismiss Plaintiffs' RICO claims is granted.[16, 17] *See RJR Nabisco*,

136 S. Ct. at 2111.

---

[15] Even if this Court were to consider the allegations that Elsaca caused a "conversion" of Bascuñan's BCI Shares, the conversion took place in Panama, when the Panamanian law firm canceled Hofstra's interest in Tarascona by registering the Tarascona bearer shares to New Tarascona. Simply removing the bearer shares from the New York J.P. Morgan safety-deposit box did not give rise to an actionable tort or cause Bascuñan to suffer an injury.

[16] While Defendants' motion was pending, Plaintiffs sought leave to file a Second Amended Complaint. (*See* Motion for Leave to File Second Amended Complaint, (ECF No. 64).) Because the proposed Second Amended Complaint also fails to sufficiently allege a domestic RICO injury, Plaintiffs' motion for leave to file an amended complaint is denied as futile.

[17] Because this case is in its early stages, judicial economy, convenience, fairness, and comity lead this Court to decline exercising supplemental jurisdiction over Plaintiffs' remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctr. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 727 (2d Cir. 2013). Accordingly, Defendants' motion to dismiss Plaintiffs' remaining state law claims is granted without prejudice.

## IV.    Conclusion

Plaintiffs' RICO claims, (AC at ¶¶ 162-206), are dismissed.  Defendants' motion to dismiss

Plaintiffs' remaining state-law claims, (*Id.* at ¶¶ 207-25), is granted without prejudice.

The Clerk of Court is directed to close the above-captioned action.

Dated: September 28, 2016
       New York, New York

SO ORDERED.

GEORGE B. DANIELS
UNITED STATES DISTRICT JUDGE