**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JORGE YARUR BASCUÑAN; TARASCONA     :
CORP.; HOFSTRA CORP.; INMOBILIARIA     :
MILANO S.A.; INMOBILIARIA E INVERSIONES :
TAURO S.A.; INVERSIONES T & V S.A.,     :
    :
           Plaintiffs,     :
    :
      -against-     :
    :
DANIEL YARUR ELSACA; CRISTIAN JARA     :
TAITO; OSCAR BRETON DIEGUEZ; GM & E     :
ASSET MANAGEMENT S.A.; FINTAIR     :
FINANCE CORP.; EUWELAND CORP.; HAY'S     :
FINANCE CORP.; CARY EQUITY'S CORP.;     :
AGRICOLA E INMOBILIARIA CHAUQUEN     :
LIMITADA; JOHN DOES 1–10; ALAPINJDP     :
INVESTING CORP.; SAN INVESTMENT     :
COMPANY LTD,     :
    :
           Defendants.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                <u>MEMORANDUM DECISION</u>
                   <u>AND ORDER</u>

                15 Civ. 2009 (GBD)

GEORGE B. DANIELS, United States District Judge:

      Plaintiff Jorge Yarur Bascuñan, as well as several entities he owns and controls (the

"Bascuñan Entities")[1], bring this action under the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, against Defendants Daniel Yarur Elsaca, several entities

he owns and controls, and two of his associates, Cristián Jara Taito ("Jara") and Oscar Bretón

Dieguez ("Bretón"). (Second Am. Compl. ("SAC"), ECF No. 76, ¶¶ 6–26.) Plaintiff alleges that

Defendants violated and conspired to violate RICO by engaging in numerous predicate acts of

racketeering activity, including mail fraud, wire fraud, bank fraud, money laundering, and

violations of the Travel Act, with the purpose and intent of misappropriating millions of dollars

---

[1] For clarity and convenience purposes, this Court refers to Bascuñan by his surname or as "Plaintiff," except
where otherwise indicated.

Plaintiff inherited from his late parents in the late 1990s. (*Id.* ¶¶ 1–3, 185–234, 236–39.) Plaintiff also asserts several state law causes of action for unjust enrichment, constructive trust, and accounting. (*Id.* ¶¶ 186–234, 236–39, 241–45, 247–50, 252–58.)

In July 2019, this case returned from the Second Circuit with the direction that this Court should instruct Defendants "to expeditiously file an answer to the SAC so that the action may proceed to discovery." *See Bascuñan v. Elsaca* (*Bascuñan II*), 927 F.3d 108, 126 (2d Cir. 2019). Defendants filed their answer on August 15, 2019. (ECF No. 119.) Defendants now move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) dismissing Plaintiff's RICO and state law claims as time-barred. (Notice of Defendants' Rule 12(c) Mot. for J. on the Pleadings, ECF No. 151.) Specifically, Defendants claim that Plaintiff's pleadings and certain documents subject to judicial notice demonstrate that Bascuñan was aware of his alleged injuries more than four years—the applicable RICO statute of limitations period—prior to the filing of this action. Defendants' motion is GRANTED as to Plaintiff's claims related to the alleged sham sale of Anacapri and the alleged theft of BCI shares. Defendants' motion is also GRANTED as to Plaintiff's state law claims for unjust enrichment and the imposition of a constructive trust. Because this Circuit's separate accrual rule applies to the other RICO injuries alleged, Defendants' motion is DENIED in all other respects regarding the RICO claims. Defendants' motion to dismiss Plaintiff's accounting cause of action is also DENIED.

## I.   RELEVANT FACTUAL BACKGROUND

In 1999, Plaintiff Bascuñan engaged his cousin, Defendant Elsaca, to manage his vast estate. (SAC ¶¶ 37, 39.) Plaintiff Bascuñan's Estate consists largely of companies and assets owned by Plaintiff, including a substantial stake in Banco de Crédito e Inversiones ("BCI"), a Chilean bank. (*Id.* ¶ 35.) Bascuñan agreed to pay Elsaca an annual salary for managing his Estate

2

(*Id.* ¶ 39.) Soon after taking charge, Elsaca convinced Bascuñan to grant him a power of attorney that conferred broad authority on Elsaca to manage the Estate and enter into transactions on its behalf. (*Id.* ¶ 40.) Plaintiff Bascuñan alleges that for the ten years Elsaca managed the Estate, he and his co-conspirators engaged in a multifaceted fraudulent scheme to misappropriate money, securities, and other assets from the Estate siphoning off approximately \$70 million. (*Id.* ¶¶ 3, 45.) The various schemes are laid out in detail in the prior decisions of this Court and the opinions of the Second Circuit. *See Bascunan v. Elsaca*, 2016 WL 5475998 (S.D.N.Y. Sept. 28, 2016); Bascunan v. Elsaca, 927 F.3d 108, 111 (2d Cir. 2019).

**A. The New York Trust Account Scheme**

The New York Trust Account scheme involved the misappropriation of assets held in two trusts owned by the Estate. (SAC ¶ 46.) The first trust, known as the "Afghan Trust," was established in 1998 and administered by J.P. Morgan in New York, and used to finance Bascuñan's charitable endeavors. (*Id.* ¶ 47.) In 2001, after Elsaca took over the management of the Estate, he established the Capri Star Trust on Bascuñan's behalf using funds from the Afghan Trust. (*Id.* ¶ 48.) The Capri Star Trust was created and administered by UBS AG in New York and its stated purpose was also to finance Bascuñan's charitable undertakings. (*Id.*) According to Bascuñan, however, the Capri Star Trust's true purpose was to generate sham investment advisor fees and legal fees, and transfer more than \$2.7 million from the Capri Star Trust to accounts under Elsaca's control. (*Id.* ¶¶ 53–56; *id.*, Ex. A.)

**B. The Anacapri Investment Fund Scheme**

The Anacapri Investment Fund Scheme involved four sub-schemes by which Elsaca allegedly misappropriated tens of millions of dollars. (*Id.* ¶¶ 68–128.) In *Bascuñan II*, the Second Circuit affirmed the dismissal of one of these sub-schemes regarding sham management fees for

3

lack of a domestic injury. *Bascuñan II*, 927 F.3d at 120. The three remaining sub-schemes revolve around the ANACAPRI Private Investment Fund, created by Elsaca in 2003. (SAC ¶ 70.) Elsaca funded Anacapri using funds from three separate Bascuñan Entities Elsaca controlled pursuant to the power of attorney. (*Id.* ¶¶ 71–72.)

### 1.   The Fintair Misappropriation

Around June 2003, Elsaca caused Anacapri to acquire Fintair, a British Virgin Islands ("BVI") company that Elsaca owned and formed in 2000. (*Id.* ¶ 74.) This acquisition made Fintair part of the Estate. (*Id.*) Despite being part of the Estate, the SAC alleges that Elsaca opened a Morgan Stanley bank account in Fintair's name, representing to Morgan Stanley that he remained Fintair's sole owner. (*Id.* ¶¶ 75–77.) Under these false pretenses, Elsaca made numerous transfers from the Estate into the Morgan Stanley bank account, transferring over \$37 million into the account. (*Id.* 75–76, 81–86; *id.*, Ex. B.) Elsaca allegedly then transferred the funds to himself, entities he owned, and associates of his. (*Id.*)

### 2.   New Tarascona and the BCI Share Theft

The Estate owned a 1.47% stake in BCI (the Chilean Bank controlled by Bascuñan's father before his death) through Tarascona Corp., a BVI entity. (*Id.* ¶¶ 8, 91.) Tarascona was in turn wholly owned by Hofstra Corp., another BVI entity that was part of the Bascuñan Estate. (*Id.* ¶¶ 9, 91.) Hofstra's interest in Tarascona was represented by physical bearer shares stored in a J.P. Morgan safety deposit box in New York.[2] (*Id.* ¶ 91.)

Notably, the BCI Share Theft has two component parts. First, the SAC alleges that in December 2007, Elsaca or one of his agents traveled to New York and removed the Tarascona

---

[2] Bearer shares are equity securities wholly owned by the individual or entity holding the physical stock certificate. Investopedia, https://www.investopedia.com/terms/b/bearer_share.asp#ixzz5Nn2c0kYR (last visited July 9, 2021).

bearer shares from Hofstra's safety deposit box. (*Id.* ¶ 92.) At the time of the alleged theft, the shares had a value of approximately \$47 million. (*Id.* ¶101.) Subsequently, Elsaca directed a Panamanian law firm to register the stolen bearer shares in the name of Nueva T Corp. ("New Tarascona"), a BVI entity Elsaca incorporated for himself on or about November 30, 2007. (*Id.* ¶¶ 94–98.) Second, Bascuñan claims that Elsaca then caused the Estate to purchase the very share that had been stolen for \$43 million. (*Id.* ¶ 102–103.) Though financially tangled, this scheme reduces to the allegation that Elsaca stole shares from Bascuñan and then sold them back to him. *Bascuñan II*, 927 F.3d at 114.

### 3. The Sham Anacapri Sale

Next, after allegedly misappropriating millions of dollars from Anacapri through Fintair, Bascuñan claims that Elsaca and his associates ultimately misappropriated Anacapri itself through a sham sale to one of Elsaca's shell companies. (*Id.* ¶ 109.) Specifically, Elsaca allegedly caused Bascuñan Entities to sell their stakes in Anacapri to Defendant Agrícola E Inmobiliaria Chauquén Limitada, a Chilean company owned by Elsaca, for \$7.5 million. (*Id.* ¶¶ 22, 113.) At the time of the sale, Anacapri had a book value of \$21.5 million, thus Elsaca "sold" Anacapri to his shell company at a \$14 million discount.

## C. The Tarascona Misappropriation

The SAC alleges that between 1999 and 2004, Elsaca opened almost a dozen accounts at Morgan Stanley in Tarascona's name "for the purpose of misappropriating [the Estate's funds] and laundering them through the global banking system." (*Id.* ¶ 129.) Bascuñan alleges that Elsaca misrepresented to Morgan Stanley in New York that he owned Tarascona (when in fact it was owned by the Estate), so that he could freely transfer money from Tarascona to his own personal

accounts. (*Id.* ¶¶ 130–32.) Elsaca allegedly transferred over \$2 million via 333 separate transfers. (*Id.* ¶ 135.)

## D. The BCI Dividend Misappropriation

From 2007 to 2010, the BCI shares earned over \$3.5 million in dividends. (*Id.* ¶ 136.) Bascuñan alleges that Elsaca misappropriated these funds by diverting them to Estate owned bank accounts, including the Morgan Stanley Fintair account, and then taking the funds. (*Id.* ¶ 136– 141.) Notably, this alleged scheme is distinct from the BCI Share Theft alleged in the SAC.

## II.   LEGAL STANDARD

A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial[.]" Fed. R. Civ. P. 12(c). "Judgment on the pleadings is appropriate if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537*, 47 F.3d 14, 16 (2d Cir. 1995). The standard for addressing a motion for judgment on the pleadings pursuant to Rule 12(c) is the same as the standard used in evaluating a motion to dismiss under Rule 12(b)(6). *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011). Accordingly, to survive a Rule 12(c) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing such a motion, a court may consider "the complaint, the answer [and] any written documents attached to them." *L-7 Designs*, 647 F.3d at 422 (citation omitted). "A complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Id.* (citation omitted and alterations in original).

6

### III.   PLAINTIFF'S RICO CLAIMS ARE NOT ENTIRELY TIME-BARRED

Bascuñan initiated this action on March 17, 2015. Neither party disputes that RICO claims are governed by a four-year statute of limitation. *Rotella v. Wood*, 528 U.S. 549, 552 (2000). The limitations period begins to run "when the plaintiff either discovers or should have discovered the RICO injury." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58 (2d Cir.1998); *see also Rotella*, 528 U.S. at 555. Thus, any injury that Plaintiff discovered or reasonably should have discovered prior to March 17, 2011 is time-barred.

Defendants assert that Plaintiff Bascuñan brought his civil RICO claims more than four years after he discovered or reasonably should have discovered his alleged injuries. (Defs.' Mem. of Law in Supp. of Mot. for J. on Pleadings ("Defs.' Mot."), ECF No. 152, at 9–24.) Specifically, Defendants argue: (1) that the SAC on its face demonstrates that Plaintiff had knowledge of his injuries before March 17, 2011; (2) that information in a KMPG report detailing an investigation commissioned by Plaintiff regarding certain irregularities with Elsaca's management should be imputed to Plaintiff; and (3) that this Court can take judicial notice of two documents (a sworn Chilean criminal complaint called a *denuncia* and a press article published on March 17, 2011), which also demonstrate that Plaintiff had knowledge of their RICO injuries prior to March 17, 2011. (*Id.* at 9–15.)

#### A.  Judicial Notice

Defendants ask this Court to take judicial notice of: (1) the sworn *denuncia* filed by Bascuñan on February 17, 2011; and (2) a press article published in Chile on March 17, 2011 that discusses Bascuñan's intention to file a lawsuit against Elsaca in the United States. (Defs.' Mot. at 15–20.) Plaintiff argues that judicial notice is not appropriate in this matter, but acknowledges that courts may take judicial notice of documents outside of the complaint for "limited purposes."

(Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for J. on the Pleadings ("Pl.'s. Opp'n") ECF No. 158, at 11–14.)

Though the question of "whether a plaintiff had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to dismiss" a court can "readily resolve the issue of inquiry notice as a matter of law on a motion to dismiss . . . where the facts needed for determination . . . can be gleaned from the complaint and papers . . . integral to the complaint." *Staehr v. Hartford Fin. Servs. Grp.,* 547 F.3d 406, 412 (2d Cir. 2008). Thus, "it is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice as well as other matters." *Id.* at 425. A court may take judicial notice of such documents "only to establish the timing and existence of the information contained in them or the existence of litigation and related filings." *Milo v. Galante,* 2011 WL 1214769, at *3 (D. Conn. Mar. 28, 2011) (citing *Global Network Comm c'ns, Inc. v. City of New York,* 458 F.3d 150, 157 (2d Cir.2006)).

Generally, if matters outside the complaint are considered in evaluating a motion under Rule 12(b)(6) or Rule 12(c), the motion to dismiss is to be treated as if it were a motion for summary judgment. Fed.R.Civ.P. 12(b); *Global Network,* 458 F.3d at 156. But if a court limits it review of these extrinsic materials to "matters of which judicial notice may be taken," those matters are not considered to be "outside the pleadings for purposes of conversion" and do not require that the Rule 12(c) motion be converted to a motion for summary judgment.[3] *Staehr,* 547 F.3d at 425–26 (*citing* Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir.1991); *see also* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366 & n. 33 (3d ed.2004)).

---

[3] Defendants' alternative motion for summary judgment is DENIED without prejudice. Defendants may renew such motion at the close of discovery.

Therefore, it is proper for this Court, in considering Defendants' motion, to take judicial notice of the *denuncia* and the Chilean press article news coverage, not for the truth of their contents but for the limited purpose of establishing the timing and existence of the information contained therein.

## B. Plaintiff's RICO Claims Premised on the Sham Anacapri Sale and the BCI Share Theft are Dismissed

Defendants argue that the SAC "on its face" demonstrates that Plaintiff had both actual and inquiry notice of their alleged RICO injuries prior to March 17, 2011. (Defs.' Mot. at 10.) Defendants point to the portion of the SAC that states that Peter Raby (Bascuñan's financial manager after Defendant Elsaca) was aware of "irregularities in connection with the ownership of Tarascona and Tarascona's BCI shares" as early as January 2011. (SAC ¶ 161.) Defendants also highlight Plaintiff's allegation that "by mid-February 2011 . . . [Bascuñan] believed that [Elsaca's] self-dealing in connection with the sale of the Anacapri fund to Chauquen had caused harm to the [Bascuñan] estate." (*Id.* ¶ 162.) These allegations relate to two alleged sub-schemes: the Sham Anacapri Sale, and New Tarascona and the BCI Share Theft.

Similarly, in the *denuncia* Bascuñan told Chilean prosecutors that in "the last few months, he ha[d] learned through his current advisors that in 2009 he was the victim of a major fraud by [Elsaca] and his advisors" and that Elsaca had "created a Private Investment Fund named ANACAPRI" and "carried out a series of complex simulated financial operations that caused him losses of at least . . . US$50,000,000." (ECF No. 153, Ex. 4 at 1.) Peter Raby's witness statement and the Chilean prosecutor's summary of the criminal complaint, both included as part of the *denuncia*, detail what was known about the theft of the BCI shares. (*Id.* at 9–10.)

The statements in the SAC and the *denuncia* establish that Plaintiff had knowledge of the injuries related to the sham Anacapri sale and the theft of the BCI shares (though not the forced buyback of those shares) prior to March 17, 2011. At oral argument Plaintiff's counsel conceded

9

that these sub-schemes fell outside of the limitations period. (Tr. of Oral Arg., dated April 29, 2021, ECF No. 188 at 78:13-23; 89:14–91:16.)  Accordingly, the RICO claims premised on the Sham Anacapri Sale and New Tarascona and the BCI Share Theft sub-schemes are dismissed.

## C.  The Separate Accrual Rule Applies to Plaintiff's Remaining Alleged RICO Injuries

Plaintiff Bascuñan argues that the "separate accrual rule" applies to his RICO claims. (Pl.'s. Opp'n at 7–10.)  The Second Circuit has stated that "in some instances a continuing series of fraudulent transactions undertaken within a common scheme can produce multiple injuries which each have separate limitations periods." *In re Merrill Lynch Ltd. Partnerships Litigation,* 154 F.3d 56, 59 (2d Cir.1998) (citing *Bingham v. Zolt,* 66 F.3d 553, 559–61 (2d Cir.1995), *cert. denied,* 517 U.S. 1134 (1996)).  Thus, under the separate accrual rule, "a new claim accrues and the four-year limitation period begins anew each time a plaintiff discovers or should have discovered a new and independent injury." *Id.* at 59.  "A necessary corollary of the separate accrual rule is that plaintiff may only recover for injuries discovered or discoverable within four years of the time suit is brought." *Bingham,* 66 F.3d at 560.

For example, in *Bankers Trust Co. v. Rhoades,* officers of a bankrupt corporation fraudulently concealed assets of the bankruptcy estate through a series of complex financial transactions and filed frivolous lawsuits against plaintiffs to prevent them from recovering a legitimate debt. *See* 859 F.2d 1096, 1098–99 (2d Cir. 1988).  The Second Circuit held that the various legal fees and expenses incurred by the plaintiffs over time were separate injuries from the loss of the debt itself, and each injury was separately subject to the statute of limitations. *Id.* at 1103.

Likewise in *Bingham,* the Second Circuit applied the separate accrual rule to a multi-scheme fraud perpetrated by Bob Marley's widow and her advisors against his estate.  66 F.3d at

557. The court held that where the defendants made "frequent misappropriations of discrete amounts of money from different sources," "each illegal diversion constituted a new and independent legally cognizable injury to [plaintiff's] estate" each with its own statute of limitations. *Id.* at 561. These injuries were caused by a variety of schemes which were related only in their ultimate goal of defrauding the estate. *Id.* at 559–61.

Defendants rely on *In re Merrill Lynch Ltd. Partnerships Litigation* and *Town of Mamakating v. Lamm*, which by contrast, found the separate accrual rule to be inapplicable. In *Merrill Lynch*, the Second Circuit found that the separate accrual rule did not apply where defendants' "limited partnership scheme was fraudulent at the outset." 154 F.3d at 59. The court found that plaintiffs' only losses occurred when they invested in an investment vehicle which "Merrill Lynch knew . . . could not make the 'guaranteed' gains" and that subsequent "communications which put a gloss on the losing investments" and "collection of annual fees" did not constitute new and independent injuries. *Id.* at 56–61. These acts were "simply a part of the alleged scheme" or "were continuing efforts to conceal the initial fraud, and not separate and distinct fraudulent acts resulting in new and independent injuries." *Id.* Similarly, in *Town of Mamakating*, plaintiffs' injury consisted of one single transfer (under false pretenses) of their zoning authority to defendants. 651 Fed. App'x 51, 54 (2d Cir. 2016). The Second Circuit found that later harm caused by the exercise of the fraudulently obtained zoning authority was part of the original injury and was not new and independent. *Id.*

*Bingham* controls the outcome of this case. The SAC here alleges that Defendants employed a "variety of schemes" each of which involved the "misappropriation of discrete amounts of money" from multiple sources within the Estate. *Bingham*, 66 F.3d at 561; *see* SAC ¶¶ 46–89, 103–108, 129–141. *In re Merrill Lynch* did not overrule *Bingham*, nor did it foreclose,

11

as Defendants suggest, the possibility that "new and independent" injuries may be suffered when they are part of the same scheme. (Defs.' Reply Br., ECF No. 159, at 3; *see also Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 448 (E.D.N.Y. 2007)). Here, Plaintiff Bascuñan alleges that he suffered multiple, independent injuries as part of Defendants RICO scheme, and each injury has a separate limitations period.

Thus, Defendants' motion is DENIED insofar as it seeks the dismissal of Plaintiff's claims related to the New York Trust Account Scheme, the Tarascona Misappropriation, BCI Dividend Misappropriation, the Fintair Misappropriation sub-scheme, and the forced re-purchasing of the stolen BCI shares. Because these schemes and sub-schemes constitute "new and independent injuries" they are not time-barred.[4]

## IV.   PLAINTIFF'S STATE LAW CLAIMS FOR UNJUST ENRICHMENT AND A CONSTRUCTIVE TRUST ARE DISMISSED

Defendants argue that Plaintiff's claims for unjust enrichment, constructive trust, and accounting are time-barred under a three-year limitations period applicable to each of these state law claims because the remedy these claims seek is money damages. (Defs.' Mot. at 24–25.) Plaintiff argues that because their state law claims are based in equity, they are subject to a six-year statute of limitations. (Pl.'s. Opp'n at 23–24.)

---

[4] Defendants present no evidence demonstrating that Plaintiff had either actual knowledge or inquiry notice of these alleged injuries. Indeed, the *denuncia* and Chilean press article are silent as to these schemes. Similarly, Defendants argue, in the absence of evidence, that Plaintiff was on "inquiry notice" prior to March 17, 2011 because the knowledge gained by KPMG during its investigation of Plaintiffs' RICO injuries can be imputed to Plaintiff. (Defs.' Mot. at 11–14.) Assuming *arguendo* that it is appropriate to impute KPMG's knowledge to Plaintiff, there are no allegations in the SAC (or any other document in the current record) that demonstrates that KPMG discovered anything about Plaintiffs' remaining RICO injuries. Indeed, the SAC specifically alleges that KPMG did *not* discover any information about the Fintair Misappropriation, the Tarascona Misappropriation, the New York Trust Account Scheme, or the forced re-purchasing of the stolen BCI shares. (SAC ¶¶ 164, 167.)

### A. Unjust Enrichment and Constructive Trust

Under New York law, the statute of limitations for unjust enrichment is three years when monetary relief is sought and six years when equitable relief is sought. *Cohen v. Dunne*, 2017 WL 4516820, at *3 (S.D.N.Y. Sept. 27, 2017) (citing *Grynberg v. Eni S.P.A.*, 2007 WL 2584727, at *3 (S.D.N.Y. Sept 5, 2007).[5] Thus, the choice of the appliable statute of limitations depends upon the substantive remedy which the plaintiff seeks.

In the Original Complaint, Plaintiff's unjust enrichment claim sought "compensatory damages, in an amount to be proven at trial, but no less than, collectively $78 million." (ECF No. 1 at 51.)  Similarly, in the First Amended Complaint Plaintiff's unjust enrichment claims sought "damages in an amount to be proven at trial, but no less than, collectively $68 million." (ECF No. 18 at 58.)  On the third attempt, Plaintiff repleaded their unjust enrichment claim and stated that "equity requires that the diverted funds . . . be returned to Bascuñan." (SAC ¶ 245.)  Plaintiff also characterized the SAC as seeking the "return/disgorgement of *all* diverted assets." (ECF No. 184 at 1, n.1.)  Moreover, instead of explicitly requesting damages, Plaintiff now seeks "an order requiring the return of all funds misappropriated by the defendants." (SAC at 70.)

---

[5] While the Second Circuit has stated that "[t]he statute of limitations in New York for claims of unjust enrichment . . . is generally six years," *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 518 (2d Cir. 2001), New York's intermediate appellate courts are split as to whether the statute of limitations for unjust enrichment claims is three or six years. *See Deutsche Bank, AG v. Vik*, 142 A.D.3d 829, 829 (1st Dep't 2016); *see also City of Almaty v. Sater*, 503 F.Supp.3d 51, 64–66 (S.D.N.Y. 2020) (describing competing approaches of New York State courts in determining limitations period for unjust enrichment). The Second Department has held that the three-year limitations period under C.P.L.R. § 214(3) applies to a claim for unjust enrichment whenever a plaintiff seeks monetary relief. *See City of Almaty*, 2020 WL 7027566, at *9–10 (collecting cases). The First Department has explicitly recognized this split and has applied the six-year limitations period when a claim for unjust enrichment rests on facts that also support another claim governed by a six-year statute of limitations, even when the plaintiff seeks damages. *Id.* (citing *Deutsche Bank, AG v.* 142 A.D.3d at 829). In the absences of any controlling decision clarifying the split, this Court follows the practice of the federal courts in this district and applies a three-year statute of limitations period when a claim for unjust enrichment seeks monetary relief. *See City of Almaty*, 503 F.Supp.3d at 65 (collecting cases).

Plaintiff's attempt to now couch his unjust enrichment claim as seeking equitable relief is unavailing. The history of this litigation makes clear that what Plaintiff actually seeks is money damages. Indeed, the Second Circuit has stated that "[t]he calculated use of the term 'disgorgement' instead of other equally applicable terms such as repayment, recoupment, refund, or reimbursement, should not be permitted to distort the nature of the claim so as to expand the applicable limitations period from three years to six." *Lia v. Saporito*, 541 F. App'x 71, 75 (2d Cir. 2013) (citing *Access Point Med., LLC v. Mandell,* 106 A.D.3d 40, 44 (1st Dep't 2013)). Accordingly, the statute of limitations applicable to Plaintiff's unjust enrichment claim is three years.

The three-year statute of limitations "begins to run upon the occurrence of the wrongful act giving rise to the duty of restitution." *Martin Hilti Family Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 466 (S.D.N.Y. 2015) (quoting *Ingrami v. Rovner*, 45 A.D.3d 806, 808 (N.Y. App. Div. 2d Dep't 2007)). Here, Plaintiff alleges that Defendant Elsaca was "relieved of most of his duties in late 2009" and officially fired by Bascuñan in March 2010. (SAC ¶ 151.) Plaintiff does not allege any wrongful action by Defendant Elsaca after 2009, but even assuming that the statute of limitations period started as late as March 2010 the unjust enrichment claim is still time-barred. Plaintiff would have had to bring his unjust enrichment claim by March 2013, a full two years before this action was filed. Thus, Plaintiff's unjust enrichment claim is DISMISSED as time-barred.

Consequently, Plaintiff's claim for a constructive trust is also DISMISSED. A constructive trust is an equitable remedy imposed to prevent unjust enrichment. *Simonds v. Simonds*, 45 N.Y. 2d 233, 242 (1978). It is not a "basis for a separate cause of action" but is instead a legal instrument by which property can be recovered if the individual holding the property was unjustly enriched.

*Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 220 (S.D.N.Y. 2018) (dismissing claim for constructive trust because it is not a basis for a separate cause of action); *I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*, 280 F. Supp. 3d 524, 545 (S.D.N.Y. 2017) (same).

## B. Accounting

The statute of limitations in New York for an accounting claim is six years. *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 518 (2d Cir. 2001); *In re Barabash's Estate*, 31 N.Y.2d 76, 80 (1972); N.Y.C.P.L.R. §213. The limitations period for claims arising out of a fiduciary relationship does not commence "until the fiduciary has openly repudiated his or her obligation or the relationship has been otherwise terminated." *Golden Pac. Bancorp*, 273 F.3d at 518 (citation omitted). Plaintiff's accounting claim cannot fairly be characterized as anything but equitable as its purpose is to "help sort out what assets are involved [and] enable the parties to meaningfully pursue their respective claims concerning their private or business arrangement." *Wesselmann v. Int'l. Images,* 259 A.D.2d 448 (N.Y.App.Div.1999). Here, the fiduciary relationship between Elsaca and Bascuñan was repudiated in March 2010. Thus, Plaintiff had until 2016 to bring a claim for an accounting. Having brought his claim in March 2015, Plaintiff's accounting claim is timely.

## V.   CONCLUSION

Defendants' motion for judgment on the pleadings, (ECF No. 151), is GRANTED (1) to the extent that Plaintiff's RICO claims related to the Sham Anacapri Sale and New Tarascona and the BCI Share Theft[6] are dismissed; and, (2) to the extent that Plaintiff's state law claims for unjust enrichment and a constructive trust are dismissed.  The Clerk of Court is directed to close the motion accordingly.

Dated: New York, New York
       August 11, 2021

SO ORDERED.

GEORGE B. DANIELS
United States District Judge

---

[6] For the sake of clarity, only the portion of the New Tarascona and the BCI Share Theft sub-scheme related to the theft of physical bearer shares worth $47 million is dismissed. Plaintiffs may still pursue their RICO claims related to the alleged forced buyback of these shares.